## Case No. 5,819.

### GRIFFING v. GIBB et al.

[1 McAll. 212.] [1]

Circuit Court, N. D. California. Aug. Term, 1857. [2]

LEGISLATIVE GRANT—EMINENT DOMAIN—NAVIGABLE WATERS — NUISANCE — POWER OF UNITED STATES COURTS.

1. A legislative grant is equivalent to a patent; and one made to a class of persons is as valid as one made to an individual.

[1] [Reported by Cutler McAllister, Esq.]
[2] [For proceedings in the supreme court, see note at end of case.]

2. The sovereign or supreme legislative power may confirm an act originally void; an individual cannot.

3. Grants from the sovereign to individuals are to be strictly construed. Such rule is applied stringently to a grant made to individuals for franchises. Such application should not be made to a purchaser under a legislative grant. It should be interpreted according to the ordinary meaning of its language.

4. This court cannot declare an act of the state legislature void because it conflicts with the fifth amendment of the constitution of the United States.

5. The state law must conflict with some provision of the constitution, impair the obligation of a contract, be an ex post facto law, or come in collision with some act of congress passed in pursuance of the constitution of the United States.

[See Bennett v. Boggs, Case No. 1,319; Albee v. May, Id. 134.]

6. A nuisance existing under a local law, if it amounts not to a national one, will not be enjoined by this court.

7. A settled construction fixed by the highest judicial tribunal in a state upon one of its statutes, will control the decision of this court, where there is no conflict between it and the constitution of the United States.

8. Each state in the Union has a right to the soil under navigable water within her territorial limits. This right is subservient only to the surrender she has made to the general government, in the constitution, of the right to regulate commerce with foreign nations, and among the several states.

This bill was filed to obtain an injunction. The facts will be gathered from the allegations of the bill and the statements in the affidavits which have been filed. The former alleges, that complainant is the owner of certain lots in the city of San Francisco, described in the bill; that he is in the exclusive possession of the same, and has erected improvements thereon to the amount of $200,000; that said lots originally fronted on and formed a part of the natural shores of the bay of San Francisco, with a deep acclivity in the rear and a bold water-front where the tide regularly ebbed and flowed and still flows, and where ships of the largest class, sailing to and from the ocean, might approach in safety and receive and discharge cargo; that in 1850 complainant commenced improvements by excavating the hill for his present warehouses; at the same time preparing a suitable wharf in front for receiving and discharging cargoes of ships; that he purchased said property with the view of acquiring the uninterrupted use and enjoyment of said water-front, which is navigable for the largest vessels; that since the erection of his warehouses on said property in 1851, he has been in the enjoyment of said water-front and receiving thereat, in navigable tide-waters, cargoes from the largest vessels; that when he commenced his improvements there was no sign or appearance of either Battery or Filbert streets at or near the premises, but the lines of said streets were only definable on some of the maps of the city of San Francisco; that defendants are engaged

in driving piles in the ground under the navigable waters of the bay of San Francisco in front of plaintiff's premises, and declare their determination to construct a wharf covering one hundred varas square, forming the northeast corner of Filbert and Battery streets, as the same are defined on the maps of the city of San Francisco,—being a lot of land 275 feet square covered by the navigable waters aforesaid, where at low tide vessels of the largest class are in the habit of passing and repassing, sailing to and from the ocean in pursuit of commerce, and especially to approach the wharves in front of the property of the complainant; that such acts of filling and wharfing by defendants are wrongful and unlawful, and contrary to the constitution and laws of the United States; that if continued and completed, as projected by defendants, they will entirely obstruct and cut off complainant from the use of the present water-front, and cut off the access of vessels to it; that the effect of piling by the defendants will be to check the current at that point, and fill up that part of the bay above and below complainant's premises with sediment, so as to render the same unnavigable; that the works of defendants will, if permitted to be continued, greatly obstruct the navigation of that part of the bay, and will especially do irreparable injury to complainant. The bill concludes with a prayer for an injunction, damages, and general relief. A motion is made upon this bill for an injunction. This has been met by numerous affidavits. It is denied that the lots claimed by complainant originally fronted on, and formed part of the natural shore of the bay; and it is distinctly averred, that complainant himself has built upon a considerable extent of the water-front beyond low-water mark.

The defendants set forth that complainant purchased two of the lots, numbers 1846 and 1847, on the 8th of March, 1851; that the act of the legislature of the state of California, commonly known as the "Beach and Water Lot Bill," was passed on the 26th March, 1851, and that previous to its passing complainant had made no considerable improvements on said lots; that in front of these lots, numbered as above, are premises owned by one John Crowell, and that on a portion of the same and in front of said lots 1846 and 1847, viz., between the easterly line of Battery and the westerly line of Front street, there now exists and has existed for the last four years a wharf of some 275 feet in length, from east to west, running to or near the westerly line of Front street, known as "Crowell's Wharf;" that in relation to two of the four fifty-vara lots that lie north of Filbert street, they were purchased by complainant on the 29th March, 1851, and that no improvements of any kind were made on the same until the passing of the said beach and water lot bill; that at the time the complainant made his first purchase, on the 8th day of March, 1851, it was notoriously known

that the only title which could be acquired to beach and water property in this city was by a grant from this state, and that at the time of the said purchase, the contemplated provisions and intent of the act which passed on the 26th March, 1851, were matters of notoriety.

It is denied, that plaintiff's warehouses have ever been situated on the water front of the bay; and it is affirmed, that at the time of the construction of the first house by complainant, it was well known to the public and to complainant that Battery street, a public street of said city, would run in front and to the eastward of said four lots of complainant; and at the time he made his first purchase of any of said four lots, said Battery street was distinctly laid out and defined on the official map of San Francisco; and that complainant holds title to two of the four fifty-vara lots which lie to the south of Filbert street under an alcalde's grant dated 13th June, 1847, to one William Hood, and the property conveyed therein, is described as a hundred-vara lot, bounded north by Filbert street, east by Battery street or place, south by Union street, and west by Sansome street, which grant was duly recorded. That on the 8th March, 1851, William Hood conveyed to complainant the northern half of said lots (1846 and 1847), and the property was described as "beginning at the southeast corner of Sansome and Filbert streets, running thence easterly one hundred varas along the southern line of Filbert street to the corner of Battery street, thence southerly along the westerly line of Battery fifty varas to a point equally distant from Filbert street and Union street, thence westerly one hundred varas to the easterly line of Sansome street at a point equidistant from Union and Filbert streets, thence north to the place of beginning, being the northern moiety of the hundred-vara lot bounded by Filbert, Battery, Union, and Sansome streets." It is also proved that the deed, from Hood to complainant, has been duly recorded. The affidavit proceeds to trace the title of complainant to the remaining lots, with a view to show that the deeds under which he holds describe the property like those above, as bounded by the same streets.

It is denied by defendants that complainant has any riparian rights. It is admitted that defendants claim title to the 100 varas which they are about to improve; that they derive title under an alcalde grant, under date of 26th June, 1848, which grant was duly confirmed according to the provisions of the act of the legislature of this state, 26th March, 1851. That record of said grant was made on the 26th June, 1848, and again on the 28th November, 1849; that by virtue of said record and grant, and by virtue of the confirmation and re-grant of same by the said legislature, defendants are owners of said premises. That under another act of

the legislature of this state, passed 15th May, 1853, entitled, "An act to provide for the sale of the interest of the state of California in the property within the water-line front of the city of San Francisco, &c.,"—the defendant, Daniel Gibb, became the purchaser of said property, and has since conveyed a moiety of same to his co-defendant, Frazer. The defendants admit their determination to improve their lot; but deny explicitly that the completion of their work will in any way obstruct the free navigation of the harbor, but will prove a decided benefit to it. Numerous affidavits from both sides have been filed; and upon bill and affidavits, a motion is made for an injunction.

Holloday, Cary & P. W. Shepperd, for complainant.

Hall McAllister, for defendants.

McALLISTER, Circuit Judge.—The title of defendants in this case rests upon a legislative grant from this state. The grounds on which complainant assails that title, are: 1st. That the acts of the legislature relied on did not pass to the grantee such interest in the land as would authorize the defendants, who have become subrogated to that title, to make the improvements they propose. 2d. If they have that effect, they are unconstitutional and void. We will consider them in their order.

A direct conveyance by legislative grant is equivalent to a patent (Lessee of Grignon v. Astor, 2 How. [43 U. S.] 319); and a conveyance by statute to classes of persons, is as legal as those made to specified individuals (Guitard v. Stoddard, 16 How. [57 U. S.] 494). The inquiry in limine is, did the acts of the legislature on which defendants rely, convey such interest as authorizes the making improvements on the lots?

The act of the legislature of this state, of 26th March, 1851 (Comp. Laws, 764), professes in its title to "dispose" of the property of the state. The first section gives the boundaries of certain land, within the limits of which the lot claimed by defendants is situated. In the second section, the use and occupation of the land previously described, and which had been sold or granted by any alcalde and confirmed by the ayuntamiento, and recorded in the manner and at the time prescribed, was granted for the term of ninety-nine years. The defendants hold under a grant from an alcalde, confirmed by the ayuntamiento, and recorded in conformity with the terms prescribed by the act of the legislature. They, therefore, come literally within the class of grantees to whom the use and occupation of the lands was intended to be granted. The third section of the act declares that the original written instrument of conveyance, or in case of its loss a record thereof. may be read in evidence in any court of justice in this state, upon the trial of any cause in which the contents of the same may be important to be proved, and shall be prima facie evidence of title and possession to enable the plaintiff to recover the land so granted. The fourth section of the act, declares that the boundary line described in section first, shall be and remain a permanent water front of said city; the authorities of which shall keep clear and free from all obstructions whatsoever, the space beyond said line, to the distance of five hundred feet therefrom. Now, if the alcalde grant be admitted ex gratia to be void, although a private individual cannot confirm that which was void, the sovereign or the legislature may. In this case, the legislature have not only granted the use and occupation of the land, but have made certain documentary title, now in the possession of defendants and produced by them, evidence of title and possession. I cannot doubt the meaning and effect of this statute.

It has been strongly urged that nothing is to be considered as passing by implication in a public grant, but it is to be strictly construed. Such is the proper construction made of a grant by the king at the suit of his subject. Such construction has been applied in its full extent by the courts of this country, to acts of the legislature granting privileges to private corporations, franchises and monopolies to individuals; but it may be well questioned, whether the rule is to be strictly applied to the purchaser under an act of the legislature. In such case, the act and every part of it, should be construed according to the ordinary and grammatical sense of its language. But it is not necessary to discuss this question; as the terms of the act under consideration clearly conveys by grant, the use and occupation of the land. That it was intended to permit structures and improvements on the land, within the water-front which had been granted, is evident from the provision introduced into the law,—that the authorities should keep clear all obstructions outside of that line. The last section of this act, provides that nothing therein contained shall be construed as a surrender by the state of its right to regulate improvements, so that they shall not interfere with the shipping and commercial interests of the bay of San Francisco. We consider this a mere reservation of the right of navigation police, by which the state very properly reserved to itself the protection of the shipping interests. The very fact that it reserved to itself the right to regulate the improvements, shows that such were contemplated to be made, and therefore such power was reserved to enable the state to interpose in case the structures made would injure the harbor.

The next act of the legislature on this subject, is that passed on 18th May, 1853 (Pamph. Laws 1853, p. 219.) This refers to the previous act, of 26th March, 1851, and the water-front adopted by it. This act makes provision for the sale of the interest

of the state in the property included in the boundaries described in the first section of the preceding act. In its 8th section it enacts that upon a sale made by the commissioners to whom by the act the sale is confided, so soon as the purchaser shall comply with the terms of sale, a deed shall be made to him, which shall be prima facie evidence of the regularity of the preliminary proceeding and sale, and the title and right of possession in the grantee his heirs and assigns, upon which actions for the recovery of real property, or for injuries thereto, may be sustained and defended in all the courts of this state.

It will be unnecessary further to discuss the question as to the quantity of interest which passed under the acts of the legislature we have had under consideration; as that question has been adjudicated on by the highest judicial tribunal in this state, to which we shall hereafter refer.

2d. The second ground taken for the complainant is, that if these acts of the legislature do pass a title to the land as alleged by defendants, they are unconstitutional and void. It is urged in argument, that the legislature of this state in the enactment of these laws have legislated retro-actively, have divested vested rights, have devoted property that should have been held sacred to public use, to private purposes; that the obstruction, if completed, will amount to a nuisance within the meaning of the definitions given to it by law. With the vindication of this law from the foregoing objections, this court has nothing to do. That must be left to the decision of the supreme court of this state. So far as this court is concerned, all the foregoing objections to these acts of the legislature may be valid; still, if neither shall be found to conflict with the constitution of the United States, or some act of congress passed in pursuance thereof, they cannot authorize it to declare those laws unconstitutional and void. Thus, if the legislature of a state were to take by its action private property for public use, without just compensation, this court could not declare it void; because the 5th amendment of the constitution of the United States, which inhibits the so doing, is only a limitation on the powers of the United States, and not applicable to the legislatures of the states. Barron v. Baltimore, 7 Pet. [32 U. S.] 243. In the case of Baltimore & Susquehanna Co. v. Nesbit, 10 How. [51 U. S.] 395, the supreme court say: That there exists in the state legislatures a power to enact retrospective laws, "is a point too well settled to admit of question at this day. The only limit upon this power in the states by the federal constitution, and therefore the only source of cognizance or control with respect to that power existing in this court, is the provision that these retrospective laws shall not be such as are technically ex post facto, or such as impair the obligation of contracts." In the case of Carpenter v.

Pennsylvania, 17 How. [58 U. S.] 456, 462, it is said: "This court has no authority to revise the act of Pennsylvania upon any grounds of justice, policy, or consistency to its own constitution. These are concluded by the decision of the public authorities of the state. The only inquiry for this court is, does the act violate the constitution of the United States, or the treaties and laws made under it?"

It is next urged, that the mischief complained of constitutes a nuisance within the meaning given by the definition annexed to that term by law. It may be admitted that the obstruction in this case may (although existing by an act of the legislature) be considered a nuisance, in view of the common-law definition of the term; yet it surely cannot be successfully contended, that it is within the power of this court to abate what the legislature has willed to exist, on the ground that it is a nuisance at common-law! Arguments and authorities adduced in relation to mere local nuisances, and as to the alleged injustice and inconsistency of these acts of the legislature of this state, are to be discarded by this court; and the question confined to the single inquiry, "Does either of these acts conflict with any provision of the constitution of the United States, or any act of congress passed under it?" Another reason precludes inquiry into them. They, as well as the interest they convey, have been adjudicated on by the constituted authorities of this state. How far is this court concluded by the construction placed by the highest judicial tribunal of this state upon one of its local statutes? In Woolsey v. Dodge [Case No. 18,032], the learned judge says: "This court brings into a state no novel principles. * * * It administers the law of the state. In giving effect to the statutes of a state, where there is no conflict with the federal constitution, the courts of the Union follow implicitly the rule established by the supreme court of the state." So far has this been carried, that the supreme court of the United States has reversed its own decision in order to conform to a change of the supreme court of a state in the construction of its statutes. In McKeen v. Delancy's Lessee, 5 Cranch [9 U. S.] 22, the principle enunciated is, that, in construing the statutes of a state, the supreme court will adopt the construction settled in the state courts, though not in accordance with its opinion. In Elmendorf v. Taylor, 10 Wheat. [23 U. S.] 157, it is affirmed, that if the construction of a state statute is settled by the highest court of a state, this court adopts the construction. "If (said C. J. Marshall) this question has been settled in Kentucky, we must suppose it to be rightly settled." Such is the unbroken authority on this point. To pursue it further is unnecessary.

We now turn to the exposition given by the constituted authorities of this state to the acts of the legislature before cited.

In the case of Eldridge v. Cowell, 4 Cal. 80, a bill was filed for the very purpose sought in the present. In that, as in this, the defendant relied upon the same legislative acts as the warrant for his structures. Under the instruction of the court, a verdict was rendered against the plaintiff. The case was carried to the supreme court. In adjudicating the case, that tribunal enunciated the following propositions: 1st. That the extension of the water-front of the city, as laid down by the survey, and in the plan of the city of San Francisco, was perfectly legitimate in the establishment of a seaport town. 2d. That the right of the owners of water-lots, to fill them in with earth for the purpose of improvement and use, was practically admitted by plaintiff, by filling in part of his own lot, and the street in front of it, which was in the water. 3d. That it was sufficient that, by the act of 26th March, 1851, the plan of the city was recognized by the state, and property covered by tide-water vested in individuals. In another case, that of Cooke v. Bonnet, 4 Cal. 397, that court again recognized the validity of the act of 26th March, 1851. By a uniform rule, we have seen it is the duty of this court to conform to the construction placed by the highest state court on the statutes of her state. This will render it unnecessary to discuss many questions which have been raised in this case; and we will confine ourselves to the question we are to decide, are these acts of the legislature of this state in conflict with the constitution of the United States, or any act of congress passed in pursuance thereof? The first inquiry is, as to the right of California to pass these laws; and this involves her right to the soil under navigable waters within her territorial limits. The second inquiry is, to what extent is such right diminished by her membership in the Federal Union? When the Revolution was consummated, the people of each state became sovereign, and in that character had the absolute right to all navigable waters and the soil under them in their then limits, and still hold that right subject to any surrender of it by the constitution of the United States. Martin v. Waddell, 16 Pet. [41 U. S.] 411. When California was admitted into the Union she became entitled to the same right, being admitted on an equal footing with the original states. Pollard's Lessee v. Hagan, 3 How. [44 U. S.] 212, 229. The right of eminent domain over the shores and soil under navigable waters, for all municipal purposes belongs exclusively to the states within their respective territorial limits, and they only have the power to exercise it. This right of eminent domain consists of the right of the sovereign to dispose of all the wealth contained in the state. Id. 223, 230. Such is the right of California to the soil under the waters of the bay; and it is only qualified by the prerogatives she has surrendered to the United States when she came into the Union. One of those prerogatives was the right to regulate commerce. Any exercise of her right of eminent domain which does not conflict with a regulation of commerce is legitimate. This statement would seem to show that a partial, local, or slight obstruction which operates only on some specific spot,—for instance, the construction of a wharf, the establishment of a water-front to the city, and the like,—cannot per se constitute such a national nuisance as would conflict with the power of congress to regulate commerce, or empower this court to abate it. The state must grossly abuse her right by an essential and material obstruction of a communication, which it is the right as well as the duty of the government of the United States to keep open as a high road to the commerce of the citizens of the United States and of the world. There may be many obstructions which a state may authorize, nay, many which by local laws would be nuisances; still, if they are not in nature essential and serious, so far as this court is concerned they must remain so long as the authorities of the state, legislative and judicial, decree their existence.

Let us see to what extent the power invoked in this case has been exerted by the federal judiciary. In Pennsylvania v. Wheeling & Belmont Bridge Co., 9 How. [50 U. S.] 647, it has been carried to a greater extent than in any case I have seen. A bill was filed to enjoin persons from the construction of a bridge across the channel of the Ohio. Before the argument of the cause, the work was completed and spanned the whole channel between Zanesville and the main Virginia shore, a distance of 1,000 feet. The cause was referred to a commissioner with power to take proofs and report whether the bridge was an obstruction, and if so, what change in the structure might be made, if any could be, consistent with the continuance of the same, that will remove the obstruction to the free navigation. Upon the report of the commissioner, finding among other things it was an obstruction, the court decided, that if the navigation could be restored by a draw, so as to render it in the opinion of the court free from unreasonable obstruction, the bridge should not be treated as a nuisance. By their final decree they directed an elevation of the bridge to the height of eleven feet above low-water mark by the Wheeling gauge of the Ohio river, such elevation to be maintained the distance of three hundred and eleven feet on a level headway over the channel of the river. Thus the bridge was permitted to span in its former dimensions over two thirds of the river's channel. If the existence of an obstruction across a navigable stream ceases by diminishing it one third, it shows that obstructions created by a state are not to be treated by this court as common nuisances. The United States and the state government both have rights, which in such cases the court is bound to protect. In Spooner v. McConnel [Case No. 13,245], the court say, "We, therefore, can entertain

no doubt that the legislature may improve at their discretion the navigable rivers of the state, and authorize the construction of any works on them which shall not materially obstruct their navigableness."

We come now to the character of the obstruction. The act of congress approved 9th September, 1850 [9 Stat. 452], under which California was admitted into the Union, declares "that all the navigable waters within the state shall be common highways, and forever free, as well to the inhabitants of said state as to the citizens of the United States, without any tax, impost, or duty therefor." This provision may be considered to 'extend to keeping the navigation free from material obstructions; and if such be the case, then if in this case the obstruction complained of were of a character to obstruct the free navigation of the waters of the bay, it would be the duty of this court to interpose. Can it be that the structure of a wharf on the front line of a city can be of such character? Such does not seem the opinion of the pilots of this port. The affidavits of seventeen of them have been filed in this case. They all swear they are duly licensed as pilots, and unite in deposing that in their opinion the contemplated structure of defendants, if completed, would in no way impede or injure the free navigation of any part of the bay now navigable, but would be an advantage to the harbor of San Francisco, by affording wharfage to many vessels that cannot now approach the wharves in that part of the bay. This body of testimony is sustained by the depositions of several others, among them George Simpton, formerly a pilot and subsequently harbormaster of this port. Opposed to this testimony there are numerous depositions filed as counter-proof. Several of these limit the apprehended danger to the immediate locality. But looking at the construction itself, we cannot consider it an unreasonable one, amounting to that national nuisance of which this court, in a controversy arising out of the action of a state towards its citizens, can take cognizance. The width of the bay opposite to the spot where the contemplated wharf is to be built, is believed to be seven miles; the width of the ship channel opposite the same spot, a fraction less than two miles; and the distance intermediate the spot where the wharf is to be built and the usual track of vessels entering into and departing from the harbor, as given by the pilots, is five hundred feet. This spot is part of the soil below low-water mark, the property of the state, granted by her to those under whom defendants claim.

There is nothing in this case which would authorize this court to declare the structure of a wharf at that locality to be a nuisance, on the ground that it impeded the free navigation of the bay. The bill does not so treat it. There is a general allegation that the work is wrongful and if continued and completed will obstruct and cut off this plaintiff from the use and enjoyment of his riparian rights, and entirely destroy his present waterfront. The only additional allegation in the bill on this point is, "that if said work be permitted to progress, the same will greatly impede the free navigation of that part of the bay now navigable, and great wrong will accrue to the public, especially to the plaintiff." There is no allegation in this bill of any obstruction which will impede or threatens to impede the harbor or bay, as a common highway. The bill is predicated upon the idea that an obstruction to any extent of a portion of navigable water by the construction of a wharf in pursuance of a system of improvement laid down by the state in establishing a water-front to her port of entry, can in itself constitute a nuisance which this court may enjoin. Upon a careful examination of this case we consider that the motion for an injunction must be denied; and it is ordered accordingly.

[NOTE. The defendants then demurred to the bill. The court sustained the demurrer, and, the plaintiff having failed to amend the bill within the time limited by the rule of court, a final decree was passed, dismissing the bill. Thereupon the plaintiff took an appeal to the supreme court. 2 Black (67 U. S.) 519. Mr. Justice Wayne delivered the opinion, holding that the complainant had shown, by the facts stated on the face of the bill, a case for relief within the jurisdiction of a court of equity, admitted by the general demurrer to be true. Nor was it possible, owing to the state of the pleadings, for the supreme court to judicially notice certain acts of the legislature of California. The decree of the circuit court was reversed.]